UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



------------------------------------X

UNITED STATES OF AMERICA

    -against-

PANTELIS KARAGEORGIS,
    also known as "Peter Karageorgis,"

        Defendant.

------------------------------------X

COMPLAINT
(18 U.S.C. §§ 1351 and 1589)

EASTERN DISTRICT OF NEW YORK, SS:

    THOMAS K. KIRWIN, being duly sworn, deposes and states that he is a Special Agent with Department of Homeland Security Immigration and Customs Enforcement, duly appointed according to law and acting as such.

    Upon information and belief, there is probable cause to believe that on or about and between July 1, 2010 and September 9, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PANTELIS KARAGEORGIS, also known as "Peter Karageorgis," together with others, did knowingly and with intent to defraud recruit, solicit and hire one or more persons outside the United States for purposes of employment in the United States by means of materially false and fraudulent pretenses, representations and promises regarding that employment.

    (Title 18, United States Code, Section 1351)

2

Upon information and belief, there is probable cause to believe that on or about and between July 1, 2010 and September 9, 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PANTELIS KARAGEORGIS, also known as "Peter Karageorgis," did knowingly and intentionally provide and obtain the labor and services of one or more persons by means of the threatened abuse of law and legal process.

(Title 18, United States Code, Section 1589)

The source of your deponent's information and the grounds for his belief are as follows:[1]

### Introduction

1. I have been a Special Agent with Department of Homeland Security Immigration and Customs Enforcement ("ICE") since July 2009. Prior to that time, I worked as an ICE deportation officer and as Customs and Border Protection officer. I am one of the ICE agents working on this investigation and am familiar with the facts of this case through my interviews of witnesses, review of records and discussions with other law enforcement officers and government investigators.

---

[1] Because the purpose of this Affidavit is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

## Probable Cause

2. On September 9, 2010, ICE received information from the United States Department of Labor ("DOL") and non-governmental agencies about the possible exploitation of Mexican nationals working, pursuant to H-2B visas, at food concessions at fairs and carnivals throughout the northeast region of the United States.[2]

3. Later on September 9, 2010, I and other ICE agents interviewed five Mexican nationals (the "Employees") who began working for the defendant PANTELIS KARAGEORGIS, also known as "Peter Karageorgis," in August 2010 at the defendant's food stands. At the time of the interviews, the Employees were being housed by the defendant in a hotel room in Queens, New York.

### Statements of Employees

4. During these interviews, the Employees provided the following information, in part and substance:[3]

   a. The Employees were recruited through an employment agency in Mexico to work for the defendant's company, "Peter's Fine Greek Foods." Pursuant to a written contract with the defendant's company, they were promised a wage of $10.71/hour for a 40-hour work-week, including a one-hour lunch break each

---

[2] H-2B visas grant temporary legal status to foreigners to work in the United States in non-agricultural jobs.

[3] The accounts provided by the Employees were materially consistent except as noted herein.

day. The Employees were advised that the defendant would obtain H-2B visas for them to work in the United States.

  b. The Employees arrived in Buffalo, New York in August 2010 and immediately began working for the defendant.[4] The Employees worked five consecutive days at the defendant's food stand at a fair in Buffalo. They worked a minimum of 16 hours each day, and did not receive their promised one-hour food break. Since the Employees arrived with no money, the only food available to them was from the concession stand, which resulted in the Employees eating only once or twice a day. The Employees, along with at least eight other of the defendant's workers, were housed in two trailers in Buffalo.[5]

  c. Immediately after the fair ended in Buffalo, the Employees were transported to Syracuse to work at the New York State Fair. In Syracuse, the Employees worked 12 days, 16 hours each day with the same conditions relating to food and

---

[4] Based on ICE records, I have determined that the Employees arrived in Laredo, Texas on or about August 12, 2010. During an interview by ICE (see Par. 9), the defendant stated that the Employees flew from Texas to Buffalo, New York on or about August 13, 2010.

[5] Under the contract, the defendant was entitled to deduct $25/week for the Employees' housing.

5

housing.[6] On the last day of the fair, the Employees worked 24 hours consecutively.

  d. At the conclusion of the fair in Syracuse, the defendant paid each of the Employees $260. The Employees were then transported to Queens, New York, which is where the defendant resides, for a layover. Because one of the trailers was sent to North Carolina with some of the defendant's workers, the five Employees were housed in a single hotel room, with only two beds, in Queens. In Queens, the defendant gave each of the Employees $100.

  e. When the Employees complained to the defendant about not being paid their full wages, he made various threats, including: (1) firing them; (2) cutting their pay; (3) preventing them from ever returning to or working in the United States again; and (4) canceling their visas and having them deported.

  f. The defendant, who traveled with the Employees the entire time, routinely berated and sought to demean them, calling them, for example, "pussies" if they complained about illness or injury.

---

[6] One of the Employees worked only 10 days because he went to the hospital to be treated for bedbug bites and swelling to his feet.

6

5.  As indicated above, since arriving in the United States over three weeks ago and working approximately 280 hours for the defendant, the Employees have been paid a total of $360.

6.  On September 9, 2010, ICE agents and DOL investigators interviewed the eight other workers who were in Queens. Most of these individuals had worked for the defendant one or more prior years[7] and had begun working for the defendant this year in approximately April. Those workers reported similar work conditions as the five Employees, ie., 12-16 hour work days[8] and little opportunity to eat and no food other than what was available at the defendant's concession stand. These workers reported that the defendant had paid them approximately $2,000 for 18 days of work between April and to June 2010.

7.  One of the Employees reported that on September 9th, as DOL investigators were interviewing the defendant's workers, the defendant instructed the Employee to tell the investigators that there were no problems working for the defendant. Similarly, many of the Employees and other workers reported to DOL, in substance, that the defendant had instructed them while they were enroute from Syracuse to Queens, that if

---

[7] Each year since approximately 2003, the defendant has employed Mexican nationals to work at his concession stands from about March to October or November.

[8] These workers also reported that on the last day of the New York State Fair in Syracuse, they were required to work 24 hours.

questioned by DOL investigators,[9] they should state that they were not required to work more than 40 hours per week and were paid $8.00 per hour. The defendant told the workers that if they failed to do so, he would fire them and have them deported back to Mexico, and would ensure that they never worked legally in the United States again.

8. When confronted by DOL investigators on September 9th, the defendant acknowledged that he owed the Employees money for their work in Syracuse. According to DOL, the defendant gave each of the Employees $300 at that time. He told DOL, in substance, that he did not have enough cash to fully settle his debt with the Employees and would pay them the rest later. As indicated below, however, the defendant had large sums of cash in his possession at the time of his arrest. See Par. 10.

Defendant's Statements

9. On or about September 9, 2010, the defendant spoke to ICE after being advised of and waiving his Miranda rights. During that interview, the defendant stated, in part and substance:

a. The defendant's workers are recruited from Mexico by his attorney, who forwards the defendant paperwork

---

[9] DOL investigators had interviewed several of the defendant's workers, as well as the defendant, in Syracuse after receiving a tip about the work conditions to which the workers were being subjected. Thus, the defendant was aware, prior to arriving Queens, that he was being investigated by DOL.

8

relating to their recruitment, including descriptions of the job duties and salaries. The defendant reviews these descriptions and, if he agrees with them, signs them so that they can be submitted to U.S. labor and immigration authorities.

   b. Until being advised by his attorney on September 9, 2010, the defendant thought the Employees were supposed to be paid $7.25/hour, and was surprised to learn that the contract actually provides for a wage of $10.71/hour.[10]

   c. Although the defendant had not yet paid the Employees for their work in Syracuse, he intended to pay them later. He did not believe the Employees were due any money for the fair in Buffalo because they did not work there.[11]

   d. The defendant never made any threats to the Employees, but only told his workers that if they left his employment he would have to notify his attorney.

   10. At the time of the defendant's arrest, he had in his pants' pockets three bulky wads of cash and also had a briefcase that he said contained money, the security of which he was concerned about. The defendant's cash was not counted and was released to the defendant's wife.

---

[10] According to DOL, the contracts for the five Employees, as well as those of the defendant's other workers who were interviewed on September 9th, provide for a wage of $10.71/hour.

[11] Notably, one of the other workers whom ICE agents interviewed on September 9, 2010, corroborated the Employees' statements that they had worked in Buffalo.

9

WHEREFORE, your deponent respectfully requests that the defendant PANTELIS KARAGEORGIS, also known as "Peter Karageorgis," be dealt with according to law.

_____
THOMAS K. KIRWIN
Special Agent
Immigration and Customs Enforcement

Sworn to before me this
10 day of September, 2010